RECEIVED

JAN 2 3 2013 *CW*

TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

ALISA CLAIBORNE                                    CIVIL ACTION NO. 6:11-CV-1552

VERSUS                                             JUDGE DOHERTY

HUB ENTERPRISES, INC.                              MAGISTRATE JUDGE HANNA

### MEMORANDUM RULING

Currently pending before the Court is a motion for summary judgment [Doc. 13], filed by

defendant HUB Enterprises, Inc. ("HUB"), whereby defendant seeks dismissal of all claims asserted

against it by plaintiff Alisa Claiborne. [Id., *see also* Docs. 13-1; 13-3, p.6]

**I.      Background**

Plaintiff brought this suit, alleging her employer engaged in unlawful discrimination in

violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and the Louisiana

Employment Discrimination Law ("LEDL"), La. R.S. 23:301, *et seq.* Specifically, plaintiff alleges

she suffered unlawful discrimination, based upon her sex, alleging she was subjected to a hostile

work environment and suffered retaliation for complaining of same. The following facts, taken from

defendant's statement of uncontested material facts, are not in dispute, except where footnoted:

1.

Plaintiff began working for HUB as a security officer on or about September
10, 2010.  Prior to beginning active duty, she underwent HUB's orientation and
training process. As part of this process, she was provided with a copy of the
employee handbook, and she was oriented on HUB's sexual harassment policy.

2.

Plaintiff was initially assigned to the BP worksite in Venice, Louisiana. She was subsequently transferred to BP sites in Houma and Gonzales.

3.

Plaintiff testified that her job performance at HUB was excellent.  Plaintiff rated her performance as ten out of ten.  She was always able to give 100%, and she was always able to complete her job duties.[1]

4.

All of the alleged harassment occurred from October 3, 2010 to October 8, 2010.

5.

In her deposition, Plaintiff testified that Carl Martin engaged in the following conduct towards her:

   1.   On October 3, 2010, when Plaintiff was first introduced to Martin, he winked at her.  Later that day, he told her "you sure are pretty - - you know, you're a pretty lady."

   2.   Martin asked Plaintiff is she was married.

   3.   On another night, Martin said, "Girl, you know, let's go out together some time." Plaintiff refused the offer, but she told him that co-worker, Gloria Mack, was single.  She was "trying to hook those two up." Plaintiff volunteered, "if he would have been my type, maybe it would have been different."

   4.   Martin told her, "I have a boat.  Let's go riding on my boat."

   5.   When no one was looking, Martin would poke his tongue out at her.

   6.   Martin grabbed her I.D. card around her neck and touched her breasts.  Then he told her to look at his pants, and "his pants started to swell up at the bottom."  Plaintiff said he then "put the clipboard over hisself [sic]."

_____

[1]Plaintiff does not dispute this statement, but adds "that the conduct of Carl Martin caused her to want to physically fight." [Doc. 17-1, p.1]

7.    Martin called her on the radio and said, "I've been watching you for thirty minutes . . . I'm across the canal."

6.

Plaintiff was unable to recite any other incidents of harassment. Plaintiff did not see Martin engage in harassment of any other people.

7.

On October 7, 2010, Plaintiff first reported the harassment to supervisors, Alan Bryant and Dwayne Hallman, site commander.  She was asked to write down all instances of harassment.

8.

Plaintiff prepared written statements on October 7, 2010 and October 8, 2010. In neither of these written statements is there any reference to any touching whatsoever. Plaintiff describes only the following conduct:

1.    Martin told her "I see what I want" while making his eyes go up and down from her head to toe.

2.    Martin asked her if she liked fishing.

3.    Martin told her she was anti-social.

4.    Martin would "do things with his eyes and mouth."

5.    Martin told her he had been watching her for twenty-five minutes talk to a safety person and asked her when she was going to do her rounds.[2]

9.

Plaintiff was advised by Hallman that HUB would promptly investigate the matter.  Plaintiff told Hallman that she wanted to move to a day shift position.  A subsequent meeting occurred on October 9, 2010.  Plaintiff again requested to be placed on a day shift position away from Martin.  Hallman told her that HUB was working on finding her an available position.  She was told that such a position was

---

[2]Plaintiff does not dispute this statement, but adds that in her October 8, 2010 written statement, she stated Martin told her "he was going to replace her." [Id.]

not immediately available, and she was told to contact Human Resources in connection with the investigation.[3]

10.

On October 12, 2010, Plaintiff traveled to Broussard, Louisiana to meet with HUB counsel and Human Resources.  Plaintiff advised them that she did not feel safe working with Carl Martin.  She related certain of the incidents of harassment to them.

11.

None of the witnesses or written statements revealed evidence of harassment. It was concluded that Plaintiffs [sic] allegations could not be corroborated.[4]

12.

HUB had a business need for a security officer on the day shift in Houma, and Plaintiff was placed in that position.[5]

13.

Plaintiff did not work from October 9, 2010 to October 12, 2010.  This was a paid leave of absence.[6]

_____

[3]Plaintiff adds defendant "does not state that the plaintiff and her sister were sent home by Dwayne Hallman after learning that the plaintiff discussed the sexual harassment with an employee of BP. [Id.]

[4]Plaintiff states she "disputes this statement to the extent that she was never advised of the outcome of defendant's alleged investigation." [Doc. 17-1, p.1] However, the Court finds the foregoing statement of plaintiff does not constitute a "dispute," but rather, is additional factual information this Court should consider.

[5]Plaintiff responds: "Plaintiff disputes this statement as it relates to the need for a Security Officer in Houma. Plaintiff requested that her shift be changed so that she did not have to work with Carl Martin. Plaintiff did not request that the location of her assignment be changed." [Doc. 17-1, p.2]  Again, the Court finds the foregoing statement of plaintiff is not a "dispute," but is additional factual information the Court should consider.

[6]Plaintiff "disputes" this statement as follows: "Specifically, plaintiff alleges that she was paid one or two weeks after the October 12, 2010 meeting and was paid in a separate check." [Id.]

-4-

14.

The pay rate for this position was $12.00 per hour, while the pay rate on the Venice BP job was $13.00 per hour. While plaintiff initially was placed at a $12.00 rate, the Company, upon discovery of this, applied a $13.00 rate to her time in Houma, and she was made whole.[7]

15.

Plaintiff had no problems working in Houma.[8]

16.

Plaintiff was transferred to work in Gonzales, which is closer to her home in Baton Rouge.

17.

Plaintiff experienced no problems when working in Gonzales.

[Doc. 13-2 (citations, footnotes omitted)]

## II.     Standard of Review

A party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Fed. R. Civ. Proc. 56(a).  As summarized by the Fifth Circuit:

When seeking summary judgment, the movant bears the initial responsibility of demonstrating the absence of an issue of material fact with respect to those issues on which the movant bears the burden of proof at trial. However, where the non-movant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by

_____

[7]According to plaintiff, she "does not dispute that her pay was eventually increased." [Id.] "However, plaintiff disputes that the defendant was unaware of the difference in pay." [Id.]

[8]Plaintiff disputes this statement, arguing: "Specifically, plaintiff reported for work and was advised that the jobsite was closed down and that her co-workers had already left. Plaintiff was not notified of this by the defendant." [Id.]

competent summary judgment proof that there is an issue of material fact warranting trial. Only when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" is a full trial on the merits warranted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

*Lindsey v. Sears Roebuck and Co.*, 16 F.3d 616, 618 (5th Cir. 1994)(citations omitted).

The Supreme Court has instructed:

[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Where no such showing is made, "[t]he moving party is entitled to a judgment as a matter of law because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."

*Lujan v. National Wildlife Federation*, 497 U.S. 871, 884 (1990)(quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).  The Fifth Circuit has further elaborated:

[The parties'] burden is not satisfied with 'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence. We resolve factual controversies in favor of the nonmoving party, but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts. We do not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts. ...[S]ummary judgment is appropriate in any case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant.

*Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)(citations and internal quotation marks omitted).

Finally, in evaluating evidence to determine whether a factual dispute exists, "credibility determinations are not part of the summary judgment analysis." *Id.* To the contrary, in reviewing all the evidence, the court must disregard all evidence favorable to the moving party that the jury is not required to believe, and should give credence to the evidence favoring the nonmoving party, as well as that evidence supporting the moving party that is uncontradicted and unimpeached. *Roberts v.*

*Cardinal Servs.*, 266 F.3d 368, 373 (5th Cir. 2001).

## III.   Analysis

### A.   Discrimination in violation of Title VII

Title VII of the Civil Rights Act of 1964 provides in pertinent part: "It shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2. "A plaintiff can prove a claim of intentional discrimination by either direct or circumstantial evidence." *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000). "Direct evidence of discrimination is evidence which, if believed, would prove the existence of a fact (i.e. unlawful discrimination) without any inferences or presumptions." *Bodenheimer v. PPG Industries, Inc.*, 5 F.3d 955, 958 (5th Cir. 1993). "Absent direct evidence of discriminatory intent, as is typically the case, proof via circumstantial evidence is assembled using the framework set forth in the seminal case of *McDonnell Douglas Corp v. Green*, 411 U.S. 792 (1973)." *Russell* at 222.

In a matter involving proof via circumstantial evidence, plaintiff must first establish a *prima facie* case of unlawful gender discrimination in violation of Title VII. *Id.* If a plaintiff is successful in establishing a *prima facie* case of discrimination, the burden then shifts to defendant to produce a legitimate, non-discriminatory justification for its actions. *Id.* If the defendant can articulate a reason that, if believed, would support a finding that the action was nondiscriminatory, "the mandatory inference of discrimination created by the plaintiff's *prima facie* case drops out of the picture and the fact finder must decide the ultimate question: whether the plaintiff has proved intentional discrimination." *Russell* at 222 (internal citations and quotation marks omitted). The Supreme Court has stated, "In appropriate circumstances, the trier of fact can reasonably infer from

the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 146 (2000).

"Thus, a plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.* at 148. "The Supreme Court has also made clear, however, that "instances [exist] where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." *Okoye v. University of Texas Houston Health Science Center*, 245 F.3d 507, 514 (5th Cir. 2001)(citing *Reeves* at 148). Finally, "it has long been the law of this circuit that 'Title VII ... do[es] not protect against unfair business decisions[,] only against decisions motivated by unlawful animus.'" *Nieto v. L&H  Packing Co.*, 108 F.3d 621, 624 (5th Cir. 1997)(quoting *Turner v. Texas Instruments, Inc.*, 555 F.2d 1251, 1257 (5th Cir. 1997), *overruled on other grounds*).

## B.     Hostile Work Environment[9]

### 1.      Applicable Law

Plaintiff alleges she was subjected to a hostile work environment.  Plaintiff can establish unlawful discrimination in violation of Title VII by proving she was subjected to gender-based harassment, which created a hostile or abusive working environment. *Harvill v. Westward*

---

[9]"Louisiana's anti-discrimination statute, La.Rev.Stat. Ann. § 23:301 et seq., is 'substantively similar' to Title VII, and Louisiana courts routinely look to the federal jurisprudence for guidance." *McCoy v. City of Shreveport*, 492 F.3d 551, 556, n.4 (2007) (quoting *Trahan v. Rally's Hamburgers, Inc.*, 696 So.2d 637, 641 (La.App.1st Cir.1997)).  Consequently, the outcome of plaintiff's hostile work environment claim "will be the same under the federal and state statutes." *Id.*  Accordingly, the Court will "analyze the issues only under the applicable federal precedents." *Id.*

*Communications, L.L.C.*, 433 F.3d 428, 434 (5ᵗʰ Cir. 2005).  As set forth in *Harris v. Forklift Systems, Inc.*:

> When the work place is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated.
>
> This standard ... takes a middle path between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury.

*Harris*, 510 U.S. 17, 21 (1993)(internal citations and quotation marks omitted).  Incidents of sexual harassment must be more than episodic to rise to the level of a hostile work environment - "they must be sufficiently continuous and concerted in order to be deemed pervasive." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 n.1 (1998).  Additionally, "in order to be actionable under the statute, a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim did in fact perceive to be so." *Id.* at 787.

In order to establish a prima facie case of discrimination premised upon the theory of hostile work environment, plaintiff must show the following: (1) she belongs to a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment of which plaintiff complained was based on sex/gender; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take remedial action.[10] *Harvill,* 443 F.3d at 434; *Ramsey v. Henderson*, 286 F.3d 264, 268 (5ᵗʰ Cir.2002).  Where the harassment is committed by a supervisor with immediate (or successively higher) authority over the harassment victim, the plaintiff need only satisfy the first four elements listed above. *Celestine v.*

---

[10]In this matter, only the fourth and fifth elements are at issue.

*Petroleos De Venezuellas SA*, 266 F.3d 343, 354 (5th Cir. 2001).

As briefly noted above, in order to affect a term, condition, or privilege of employment (element 4), the harassment complained of must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Celestine* at 354 (internal quotation marks omitted); *Harvill* at 434; *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012). To determine whether conduct is severe or pervasive, courts look to the totality of the circumstances. *Stewart v. Mississippi Transp. Com'n*, 586 F.3d 321, 330 (5th Cir. 2009). Relevant factors include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. However, "'[M]ere utterance of . . . [a gender based] epithet which engenders offensive feelings in an employee' would not sufficiently alter terms and conditions of employment to violate Title VII." *Faragher* at 787 (alterations in original) (quoting *Rogers v. E.E.O.C.*, 454 F.2d 234, 238 (5th Cir. 1972)). Likewise, "discourtesy or rudeness should not be confused with . . . [sexual] harassment and . . . a lack of . . . [gender] sensitivity does not, alone, amount to actionable harassment." *Id.*

As noted by the *Faragher* court:

> These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a general civility code. Properly applied, they will filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing. We have made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment. . . .

*Faragher* at 786-88(internal citations and quotations omitted).

## 2. Whether the alleged harassment affected a term, condition, or privilege of employment

-10-

Defendant asserts "[p]laintiff's allegations are legally insufficient," in that "[p]laintiff's allegations do not amount to conduct that is objectively severe, pervasive and extreme enough to sustain a hostile work environment claim under Title VII." [Doc. 13-3, pp.12, 13] In support of this position, defendant argues:

> By Plaintiff's own admission, the complained of conduct did not unreasonably interfere with her performance, and thus one of the critical elements set forth in *Harris* is not met. Plaintiff cannot proffer any evidence whatsoever that the alleged conduct by Martin adversely affected her ability to do her job. One [sic] a scale of one to ten, with ten being the highest, Plaintiff rated her performance as a security officer as a ten. Plaintiff testified that she was always able to give 100% on the job, and she completed all of her job duties. Clearly, the alleged behavior was not so severe or pervasive that it prevented Plaintiff from performing her job.

[Doc. 13-3, pp. 13-14] While the Court agrees plaintiff testified Martin's alleged conduct did not unreasonably interfere with her work performance (except to the extent it "caused her to want to physically fight")[11], this is merely one of many factors the Court should look to in determining whether plaintiff was subjected to an abusive work environment. *See e.g. Harris* at 22-23 ("[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances. These may include . . . whether [the discriminatory conduct] unreasonably interferes with an employee's work performance."); *see also Hockman v. Westward Communications, LLC*, 407 F.3d 317, 325-26 (5th Cir. 2004).

Defendant further contends:

> Plaintiff's allegations fall short of the 'extreme' conduct necessary to amount to a change in the terms and conditions of employment needed to state a hostile work environment claim. To survive summary judgment, the alleged harassment must be "so severe and pervasive that it destroys a protected class member's opportunity to succeed in the workplace." *Hockman v. Westward Communications, LLC*, 407 F.3d

_____

[11] *See* p.2, ¶3 and n.1, *supra*.

-11-

317, 326 (5th Cir. 2004).[12]

> Fifth Circuit jurisprudence establishes that Martin's alleged conduct does not rise to the level of actionable harassment, as it is neither severe or pervasive enough.

[Doc. 13-3, p.14 (citation omitted)] Defendant citing *Hockman*, as well as three unpublished cases[13], argues the Fifth Circuit has found equally offensive conduct to be insufficiently severe or pervasive to create an abusive working environment. [Id. at 14-15]

In response, plaintiff argues:

> In the present case, while plaintiff did testify that she continued to do her job, the actions of Carl Martin were severe and pervasive enough that the plaintiff requested to be moved to another shift in order to avoid Carl Martin. Plaintiff further testified in her deposition that the conduct was "really getting nerve-wracking and to the point where I was going to fight physically."
>
> . . . . The plaintiff asserts that any reasonable person should find that having their breasts touched, being repeatedly asked out by a Supervisor despite repeated refusals, being shown an erect penis and having a tongue repeatedly "snaked" at them would create a hostile and abusive working environment. Again, plaintiff testified that she was to the point of wanting to fight physically. Any reasonable jury should conclude that a person in the plaintiff's shoes would find the actions of Carl Martin to be hostile and abusive when looking at the totality of the circumstances.

[Doc. 17, pp. 6-7]

Again, plaintiff alleges over a five day period she was subjected to a hostile work environment by virtue of the following: "Plaintiff alleges that Carl Martin intentionally touched her breasts, held his clipboard in front of his lower body asking her 'why are you doing this to me,' referring to his erect penis, repeatedly asked her out despite her repeated refusals and would 'snake'

---

[12]As noted by the *Harvill* court, 433 F.3d at 435, the standard set forth in *Hockman* ("severe and pervasive") is incorrect: the actual standard, as set forth by the Supreme Court in *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986), is "severe <u>or</u> pervasive." *Harvill* at 435 (emphasis added).

[13]U.S. Ct. of App. 5th Cir. Rule 47.5.4 provides that in general, unpublished opinions issued after January 1, 1996 are not precedent.

his tongue out at her, implying he wanted to lick her." [Doc. 17, p.2; *see also id.* at 5, 7] As previously noted, the one published Fifth Circuit opinion offered in support of defendant's position that the foregoing conduct was insufficiently severe or pervasive to constitute a hostile work environment claim is *Hockman, supra.* In *Hockman,* plaintiff alleged in the approximate year and a half that she worked for defendant, she was harassed by a co-worker in the following ways: (1) her co-worker once made a remark to plaintiff about another employee's body, (2) he asked plaintiff to come to the office early so that they could be alone,[14] (3) he once slapped her on the behind with a newspaper,[15] (4) he "grabbed or brushed" against Hockman's breasts and behind[16], (5) he once held her cheeks and tried to kiss her, and (6) he once stood in the door of the bathroom while she was washing her hands.[17]  *Id.* at 328.  On these facts, the Fifth Circuit found, "As a matter of law, the conduct described by Hockman was not so severe or pervasive as to affect the terms, conditions, or privileges of her employment."  *Id.* at 329.

Although not discussed (other than by passing reference) in defendant's brief, a year later, the Fifth Circuit issued its opinion in *Harvill v. Westward Communications, L.L.C.,* 433 F.3d 428 (5th Cir. 2005).  *Harvill* was actually a co-worker of Hockman's, and she alleged she was sexually harassed by the same co-worker as Hockman.  In *Harvill,* plaintiff testified during a seven-month period, her co-worker "grabbed her and kissed her on the cheek, popped rubber bands at her breasts,

---

[14]The Fifth Circuit characterized acts (1) and (2) as "offhand comments that are boorish and offensive, but not severe."  *Hockman* at 328.

[15]The Fifth Circuit described this conduct as "simple teasing, which will not amount to discriminatory changes in the terms and conditions of employment."  *Id.* (internal quotation marks omitted).

[16]The opinion notes that the record was "unclear as to how, exactly" plaintiff was inappropriately touched, and that plaintiff admitted the "brushings" were neither severe nor pervasive.  *Hockman* at 326.

[17]The Fifth Circuit described acts (5) and (6) as "isolated incidents that were not serious."  *Id.*

fondled her breasts 'numerous times,' patted her on her buttocks 'numerous times,' and came behind her and rubbed his body against her." *Id.* at 436.  The Fifth Circuit noted, "Undoubtedly, the deliberate and unwanted touching of Harvill's intimate body parts can constitute severe sexual harassment." *Id.* (citing *Worth v. Tyler*, 276 F.3d 249, 268 (7th Cir. 2001) ("[D]irect contact with an intimate body part constitutes one of the most severe forms of sexual harassment.")).  The Court concluded, "Viewing the evidence in the light most favorable to Harvill, the non-movant, we conclude that a reasonable jury could find that Rogers' conduct was sufficiently severe or pervasive to alter a term or condition of Harvill's employment." *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); and *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  The Court subsequently, in dicta, distinguished the facts in *Harvill* - "specifically as they relate to whether the harassment was 'severe or pervasive'" - from the facts in *Hockman,* stating as follows:

> As it relates to our prior discussion of "severe or pervasive" standard, we note the two cases are distinguishable. Harvill stated that Rogers touched her breasts "numerous times" and would pat her buttocks. She also averred that she protested *every time* Rogers touched her breasts and she also protested when Rogers would pat her buttocks. As previously stated, we find that the harassment Harvill endured satisfies the disjunctive standard. By contrast, Hockman alleged that "Rogers 'would sort of brush up against [her]'" and she admitted that "these *brushings* were neither severe nor pervasive." *Hockman*, 407 F.3d at 326 (emphasis added). In her deposition testimony, Hockman admitted that she did not protest when he brushed up against her because the incidents were over before she had the chance to say anything. "In fact, at first she thought they were accidental, stating that 'just as quickly as [an incident] started, ... it ended .... And once it was over, it was over.'" *Id.* (second omission in original).

*Harvill* at 438, n.2.[18]

---

[18]*See also Donaldson v. CDB Inc.*, 335 Fed.Appx. 494, 504 (5th Cir. 2009)(The Court, in distinguishing *Hockman* from the facts before it, noted that although the allegations in both matters were "similar in severity . . ., the regular, pervasive nature of the incidents in this action, coupled with the limited time period within which this took place (five months)," sufficed to create an issue of material

In the case before this Court, there is an allegation that Martin "intentionally touched [plaintiff's] breasts." [Doc. 17, p. 2; *see also id.* at 5, 7] This act alone arguably, "can constitute severe sexual harassment." *Harvill* at 436; *see also Indest*, 164 F.3d 258, 264 (5th Cir. 1999)(In finding the alleged harassment did not affect a term, condition, or privilege of employment, the court noted it was "significant" to its analysis that the harasser never touched the victim.)  Although tenuous, viewing the affidavits and deposition testimony in the light most favorable to plaintiff, the Court finds there exists a genuine issue of material fact as to whether the alleged sexual harassment rises to the level of severe or pervasive, particularly in light of the allegation of the intentional touching of plaintiff's intimate body parts and the compressed, but continuous, period of time during which the offensive behavior occurred.[19]

### 3.    Employer liability

Having found plaintiff has met her prima facie burden with regard to elements (1) through (4) of her hostile work environment claim, the Court turns next to the question of whether HUB may be held liable for the harassment to which plaintiff was allegedly subjected by Martin. Defendant contends Martin was not plaintiff's supervisor, in the manner contemplated by Title VII; plaintiff contends he was.  [Doc. 13-3, p.17; Doc. 17, pp.7-8] Again, when a claimant alleges a co-worker created a hostile work environment, she must show the following: (1) she belongs to a protected

---

fact with regard to whether the conduct was sufficiently severe or pervasive.)

[19]*See e.g. Shepherd v. Comptroller of Public* Accounts, 168 F.3d 871 (5th Cir. 1999)(harassing conduct was infrequent where it occurred over two year period); *Donaldson, supra* ("[T]he regular, pervasive nature of the incidents in this action, coupled with the limited time period within which this took place (five months)," sufficed to create an issue of material fact with regard to whether the conduct was sufficiently severe or pervasive.); *Alaniz v. Zamora-Quezada*, 591 F.3d 761, 772 (5th Cir. 2009)(Evidence was sufficient to support hostile work environment claims where, over 32-day period, owner repeatedly asked first employee out, propositioned her, commented on her physical appearance and dress, and made bodily contact with her, and, with respect to second employee, owner initiated unwanted and inappropriate contact and directly propositioned her on multiple occasions.)

group; (2) she was subjected to unwelcome harassment; (3) the harassment of which plaintiff complained was based on sex/gender; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take remedial action. *Harvill*, 443 F.3d at 434.  However, where a claimant alleges "a supervisor with immediate (or successively higher) authority over the employee" was the harasser, the plaintiff "need only satisfy the first four elements of the test outlined above." *Celestine*, 266 F.3d at 354.[20]

        In cases involving harassment by a supervisor, if the harassment did not culminate in a "tangible employment action" against the employee[21], the employer "may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence." *Faragher*, 524 U.S. at 807; *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765 (1998). "The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid

---

        [20]Stated differently, plaintiff need only show the fifth element where the harassment was committed by a co-employee.

        [21]"A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). In supervisor harassment cases, if the complaining employee suffered a "tangible employment action," the claim is classified as a "quid pro quo" case; otherwise, the claim is classified as a "hostile work environment" case. *Wyatt v. Hunt Plywood Co., Inc.* 297 F.3d 405, 409 (5th Cir. 2002). In quid pro quo cases, if the employee can show a tangible employment action resulted from his acceptance or rejection of sexual harassment by his supervisor, "the employer [is] vicariously liable, *ipso facto*; no affirmative defense will be heard." *Casiano v. AT&T Corporation*, 213 F.3d 278, 283 (5th Cir. 2000) In this matter, although plaintiff does allege she suffered a tangible employment action as a result of reporting the harassment (which will be addressed in the section entitled "Retaliation"), she does not allege she suffered a tangible employment action as a result of refusing to submit to Martin's sexual invitations. Accordingly, assuming Martin is plaintiff's supervisor, the *Ellerth/Faragher* affirmative defense is available to HUB.

harm otherwise."[22] *Id.*   The defendant "bears the burden of proving both elements by a preponderance of the evidence." *Aryain v. Wal-Mart Stores Texas LP*, 534 F.3d 473, 483 (5th Cir. 2008). Unfortunately, neither the Fifth Circuit nor the Supreme Court has directly addressed the question of who is a "supervisor" within the context of employer liability established in *Ellerth* and *Faragher.*[23]

Defendant argues Martin was not plaintiff's supervisor, because "[i]t cannot be disputed that Martin did not have the authority to hire, fire, promote, demote, or transfer Plaintiff."[24] [Doc. 13-3, p.12; *see also* Doc. 13-4, ¶ 7] Defendant further asserts, "Martin's responsibility was limited to oversight of aspects of Plaintiff's job performance and the ability to recommend discipline." [Id.]

---

[22]Essentially, in "supervisor" harassment cases, unlike "co-worker" harassment cases, the plaintiff need not prove "knowledge" to establish the employer's liability for the harassment.

[23]*But see Aryain*, 534 F.3d at 479, n.4 and 482, n.6 (5th Cir. 2008)(Plaintiff, a cashier in the Tire Lube Express Department at Wal-Mart, alleged "her superior in the TLE Department" subjected her to a hostile work environment; the Fifth Circuit, citing the holding in *Ellerth* that an employer may be vicariously liable "for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee," then states, "There is no dispute that Hayes was Aryain's supervisor during the period of alleged harassment"); *McCullough v. Kirkum*, 212 Fed.Appx. 281, 283, n.5 (5th Cir. 2006)(noting, in dicta, "Courts have also adopted different tests for determining whether an employee is a supervisor or a co-worker")(citing *Parkins v. Civ. Constr. of Ill.*, 163 F.3d 1027, 1034 (7th Cir.1998) (individual considered supervisor if he has "the authority to affect the terms and conditions of the victim's employment"); and *Mack v. Otis Elevator Co.*, 326 F.3d 116, 126-27 (2d Cir. 2003) (rejecting *Parkins'* test and holding that individual may be considered a supervisor if he has authority to direct employee's day-to-day work activities)); *see also* Deborah F. Buckman, Annotation, *Who is "Supervisor" for Purposes of Sexual Harassment Claim Under Title VII of Civil Rights Act of 1964 (42 U.S.C.A. §§ 2000e et seq.) Imputing Liability to Employer*, 195 A.L.R. 463 (2004).

[24]As noted, neither the Supreme Court nor the Fifth Circuit has directly addressed who is a supervisor for purposes of Title VII. While the Supreme Court in *Ellerth* did utilize the language upon which defendant relies - "[a] tangible employment action constitutes a significant change in employment status, such as firing, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits" - it did so "only to 'identify a class of [hostile work environment cases' in which an employer should be held vicariously liable (without an affirmative defense) for the acts of supervisors." *Burlington Norther and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006)(quoting *Ellerth* at 761). Additionally, the Court again notes *Aryain*, 534 F.3d at 479-82, in which the Fifth Circuit appears to embrace a broader concept of "supervisor" than merely "authority to hire, fire, promote, demote, or transfer."

On the other hand, plaintiff points out that on her October 5, 2010 "daily Shift Activity Report," Martin signed off on the report in the space designated "Supervisor Name." [Doc. 17, p.8; *see also* Doc. 17-2, p.11] Plaintiff additionally points out that in the Declaration of John Jablunovsky submitted by defendant, the declarant states while investigating plaintiff's claims, **"I also reviewed other written statements of employees under Martin's supervision."** [Id. (emphasis in original); *see also* Doc. 13-4, ¶ 2] Finally, plaintiff points out that in defendant's brief, when discussing the investigation HUB conducted into plaintiff's allegations, defense counsel states "Jablunovski also reviewed . . . written statement of other employees under Martin's supervision." [Id.; Doc. 13-3, p. 10]

Based upon the documents before this Court, there is insufficient evidence to conclude Martin was not plaintiff's supervisor. Accordingly, the Court will proceed in the manner most favorable to plaintiff, and assume for purposes of this motion, only, that Martin was her supervisor. As such, the *Ellerth/Faragher* affirmative defense is available to defendant.[25] However, as defendant limited its briefing to a claim for co-worker harassment (as opposed to supervisor harassment), neither party has directed its argument toward application of the *Ellerth/Faragher* affirmative defense. Accordingly, within five days of issuance of this Ruling, the parties may submit supplemental briefing, no more than five pages in length, addressing whether there exists a genuine issue of material fact as to: (1) whether defendant exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (2) whether the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by defendant or failed to avoid harm otherwise.

_____

[25]The Court notes defendant asserted this affirmative defense in its Answer to plaintiff's complaint. [Doc. 3, p. 4]

### C.    Retaliation

Section 2000e-3(a) of Title VII - the antiretaliation provision - "prohibits an employer from 'discriminat[ing] against' an employee or job applicant because that individual 'opposed any practice' made unlawful by Title VII or 'made a charge, testified, assisted, or participated in' a Title VII proceeding or investigation." *Burlington Northern & Santa Fe Railway Co., v. White*, 548 U.S. 53, 56 (2006)(quoting 42 U.S.C. § 2000e-3(a)). "The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Id.* at 67. "An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Id.*

To establish a *prima facie* case of retaliation, a plaintiff must show: (1) she engaged in activity protected under Title VII; (2) she suffered an adverse employment action; and (3) a causal link exists between the protected activity and the adverse employment action. *Banks v. East Baton Rouge Parish School Board*, 320 F.3d 570, 575 (5th Cir.2003). In order to satisfy the second element, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington* at 68 (internal quotation marks omitted).[26] Regarding the third element, the causal link need not rise to the level of a "but for" standard, and the plaintiff "need not prove that her protected activity was the sole factor motivating

---

[26]"By focusing on the materiality of the challenged action and the perspective of a reasonable person in the plaintiff's position, . . . [the retaliation] standard will screen out trivial conduct while effectively capturing those acts that are likely to dissuade employees from complaining or assisting in complaints about discrimination." *Burlington* at 69-70. Of note, *Burlington* rejected the Fifth Circuit approach which limited "adverse employment actions" to "ultimate employment decisions." *Burlington* at 59.

the employer's challenged decision in order to establish the 'causal link' element of a prima facie case.'" *Gee v. Principi*, 289 F.3d 342, 345 (5th Cir. 2002)(quoting *Long v. Eastfield Coll.*, 88 F.3d 300, 305, n.4 (5th Cir.1996)). "If the plaintiff successfully presents a *prima facie* case, the burden shifts to the employer to provide a 'legitimate, non-retaliatory reason for the adverse employment action.'" *Hernandez*, 670 F.3d at 657 (quoting *Long*, 88 F.3d at 304–05). "If the defendant presents evidence that supports that it acted properly, the fact-finder must decide whether retaliation was the but-for cause for the employer's action." *Id.*

Defendant asserts plaintiff cannot meet the second and third elements of her *prima facie* burden, arguing plaintiff cannot show she suffered adverse employment actions, nor can she "establish a causal link between her report of harassment and the alleged retaliation." [Doc. 13-3, p. 22; Id. at pp. 20-25] In her opposing brief, plaintiff supports her *prima facie* burden as follows:

> In the present case, the plaintiff complained to the defendant regarding sexually harassing behavior by Carl Martin. Immediately thereafter, the plaintiff as well as her sister, Debbie Claiborne, were sent home for four days without being paid. Only after another meeting with a Human Resource Representative and counsel for the defendant was the plaintiff paid for the four days of work. Subsequently, plaintiff was transferred to a position in Houma, Louisiana where her pay was changed to $1.00 lower which plaintiff asserts is a materially adverse employment action. In addition on November 22, 2012 [sic], while working at the Houma, Louisiana jobsite, plaintiff reported for work and was advised by a hotel clerk that all of the other employees of the defendant, which consisted of at least 8 other people, were gone. Plaintiff was never notified that she should not report for work and she was never notified that the Houma location had been closed. Plaintiff asserts that the actions of the defendant after her complaints of being sexually harassed were materially adverse to her and directly related to her complaints. Plaintiff argues that the mere fact that in "hindsight" the alleged oversight regarding her pay was corrected is irrelevant.

> The defendant's assertion that Dwayne Hallman advised the plaintiff to take a couple of days off while the harassment investigation was underway is false. The plaintiff and her sister, Debbie Claiborne, were advised to "pack up" her stuff and "go home" after David Hallman became upset that the sexual harassing behavior was

-20-

discussed with employees of its client, B.P.   Defendant has not offered any legitimate, nonretaliatory reason as to why the plaintiff's sister would have been sent home.

[Doc. 17, pp. 10-11]

With regard to the delay in pay for the four days plaintiff did not work, defendant asserts when plaintiff first notified her supervisors of the alleged harassment on October 7, 2010, she requested to be moved to a day shift position. [Doc. 13-2, ¶ 9] On October 9, 2010 (the first of the four day period for which plaintiff's pay was delayed), at her second meeting with her supervisors, plaintiff again requested that she be moved to a day shift position away from Martin.[27] [Id. at ¶¶ 7, 9; Doc. 13-4, ¶¶ 3, 4] Plaintiff's supervisor, Dwayne Hallman, advised plaintiff that defendant was attempting to find her a day shift position, but such a position was not immediately available. [Doc. 13-2, ¶ 9] Mr. Hallman instructed plaintiff to contact Human Resources in connection with the investigation. [Doc. 13-4, ¶ 4] Shortly thereafter, plaintiff was moved to a day shift at the Houma location.  According to Mr. Hallman's declaration, "Since the Houma position was not immediately available, this resulted in Plaintiff being off of work for four days.  She was compensated in full for these four days." [Id. at ¶ 8]

With regard to plaintiff being paid $1.00 less per hour when she transferred to the Houma jobsite, Mr. Hallman testified:

> When Plaintiff was transferred to Houma, the pay rate for that location was $12.00 per hour.  Mrs. Claiborne was initially placed at the $12.00 per hour rate, but once we discovered this, we applied a $13.00 rate to her time in Houma.  She was paid for a rate of $13.00 per hour for all hours worked in Houma.

---

[27]Again, plaintiff last worked with Martin on October 8, 2012, the day in between the two meetings with supervisors.

[Doc. 13-4, ¶ 6][28] Defendant argues, "Plaintiff acknowledges that she was made whole for this pay difference and suffered no loss of pay." [Doc. 13-3, p.20] Defendant further asserts, "the move was made strictly to accommodate Plaintiff's requests to be transferred to a day shift position." [Id. at 21]

With regard to the November 22, 2010, incident in which plaintiff reported for work at the Houma site, not knowing the location had been closed, Mr. Hallman testified: "The failure to notify Plaintiff the Houma worksite had been closed was an oversight. She should have been called in advance.  HUB paid Plaintiff for her time and expenses in traveling to Houma." [Doc. 13-4, p.3]

While the Court finds it is doubtful that plaintiff has carried her *prima facie* burden with regard to the second and third elements of her retaliation claim (*i.e.* adverse employment action and causal link), it need not conduct an exhaustive analysis of those issues.  In this case, defendant has provided "a legitimate, non-discriminatory justification for its actions." *Russell*, 235 F.2d at 222. Regarding the four days during which plaintiff did not work but for which she nevertheless received compensation (*i.e.* from October 9 to October 12, 2010), defendant has satisfied its burden of production and shown this was not a situation in which plaintiff was suspended without pay in retaliation for her charges of sexual harassment - rather, plaintiff was not working during that time because the company was attempting to accommodate her request to be moved to a daytime shift. According to plaintiff's affidavit, "approximately one or two weeks" after she met with Human Resources and HUB counsel (*i.e.* on October 12, 2010), she "was paid in a separate check for the four days that [she] missed from work at the instruction of Dwayne Hallman." [Doc. 17-2, p.1] There is nothing inherently retaliatory in an employee receiving payment for his or her work two weeks after the work is completed - in fact, such would appear to be customary in the employment context.

---

[28]Neither party has advised this Court when the discrepancy in pay was rectified.

Regarding the temporary reduction in her pay when plaintiff was provided a daytime shift as she requested, defendant asserts this was simply an oversight due to the different geographic work locations which was rectified as soon as it was discovered, and plaintiff has offered no evidence to the contrary other than her personal, unsupported belief that this was in retaliation for her complaints. Regarding the failure of defendant to notify plaintiff that the Houma location had been closed, the Court finds that is merely one of the "petty slights or minor annoyances that often take place at work and that all employees experience," and was not an act of retaliation. *Burlington* at 67. In sum, once plaintiff brought her complaints of sexual harassment to defendant, defendant immediately began an investigation, and despite its inability to confirm plaintiff's allegations, it nevertheless accommodated plaintiff in all her requests. In light of the foregoing, the Court finds plaintiff has failed to show a genuine issue of material fact exists as to whether she was the victim of intentional discrimination. *Russell*, 235 F.2d at 222.[29]

Finally, in her complaint, plaintiff additionally asserts a claim of retaliation pursuant to the Louisiana Employment Discrimination Law, La. R.S. 23:301, *et seq.* Although plaintiff appears to have abandoned that claim as she has failed to address it in her briefing, out of an abundance of caution, the Court notes, "Retaliation based on race does not fall within the scope of Louisiana Employment Discrimination Law." *Corley v. Louisiana ex rel. Div. of Admin., Office of Risk Management*, 2012 WL 5951550, *2 (5th Cir. 2012); *see also Glover v. Smith*, 478 Fed.Appx. 236, 243-44 (5th Cir. 2012) Therefore, plaintiff cannot prevail on her retaliation claim brought by way of the LEDL. *See e.g. Glover* at 244.

---

[29]Although not addressed by either party, the Court additionally notes plaintiff has not shown the retaliation she allegedly suffered produced any injury or harm. *Burlington*, 548 U.S. at 67.

**IV.     Conclusion**

In light of the foregoing, the motion for summary judgment [Doc. 13] is GRANTED IN PART and DEFERRED IN PART.  The motion is GRANTED to the extent it seeks dismissal of plaintiff's claims of unlawful retaliation in violation of Title VII and the LEDL; the motion is DEFERRED to the extent it seeks dismissal of plaintiff's claims of hostile work environment in violation of Title VII and the LEDL.  Within five (5) days of issuance of this Ruling, the parties may submit supplemental briefing, no more than five (5) pages in length, addressing whether there exists a genuine issue of material fact as to: (1) whether defendant exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (2) whether the plaintiff unreasonably failed to take advantage of any preventative or corrective opportunities provided by defendant or failed to avoid harm otherwise.  Failure to submit he foregoing supplemental briefing will likely result in dismissal of plaintiff's claims for hostile work environment.

THUS DONE AND SIGNED in Chambers, Lafayette, Louisiana, this _23_ day of January, 2013.

REBECCA F. DOHERTY
UNITED STATES DISTRICT JUDGE

-24-